[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
Following a trial in the Montgomery County Court of Common Pleas, Edward Lee Reeves III was found guilty of aggravated robbery, aggravated burglary, and aggravated murder, each with firearm and repeat violent offender specifications, and of having a weapon while under disability. The trial court sentenced him accordingly, and he appeals.
On the evening of November 23, 1996, Barry Rogers was fatally shot during a burglary and robbery of the residence located at 2257 Koehler Avenue in Dayton, Ohio where he had lived with his fiancé, Mildred Denise Brookshire, and her three-year-old son, Denton. Reeves was indicted on February 4, 1997 for his involvement in the incident, and he pleaded not guilty to the charges. On April 11, 1997, Reeves filed a motion to suppress the identification testimony of Brookshire and a motion in limine to exclude Christina M. Hampton's testimony regarding a statement that he had allegedly made to her on November 23, 1996. Following a hearing on April 25, 1997, the trial court overruled Reeves' motion to suppress Brookshire's identification testimony. On May 15, 1997, Reeves filed a second motion in limine seeking to exclude evidence of his other criminal or wrongful acts, statements made by co-conspirators Julien Jackson and Derrick Williams, photographs taken at the scene, and any slides, projections, or prints taken by the coroner. Pertinent to this appeal, the trial court overruled the April 11, 1997 motion in limine and refused to exclude the use of the coroner's slides at trial.
The evidence presented by the state at trial established the following.
Brookshire testified that, on the evening of November 23, 1996, she and Rogers had been in the living room watching television when she heard an odd banging noise coming from the kitchen, which was located at the back of the house. She got up, walked from the living room through the dining room and into the kitchen, and saw a man standing in the kitchen. Thinking that he was a neighbor playing a joke, Brookshire approached the man, who pointed a gun at her head and told her not to look at him and that it was no joke. When Denton entered the kitchen, the man pointed the gun at him, and Brookshire pulled him behind her. The man ordered her to get down on the kitchen floor. Shortly thereafter, a second man wearing a mask entered the kitchen and took Brookshire and Denton into the dining room. At that time, Rogers came into the dining room, and the first man pointed a gun at his head and ordered him to get "his white ass on the floor." Rogers complied and was then ordered by the first man to go into the bathroom, while Brookshire and Denton were taken into the living room by the masked man. In the living room, Brookshire got down on the couch, and the masked man held a gun to the back of her head. When Brookshire no longer felt the pressure of the gun against her head and saw no one in the room, she grabbed Denton and a telephone and rushed into a closet. At some point, she heard a single gunshot. Inside the closet, Brookshire dialed 911 and explained the situation to a police dispatcher. When police officers arrived at the residence, they discovered that the men were gone, and they found Rogers' dead body lying on the bathroom floor. They removed Brookshire and Denton from the home and took them to the police station.
Hampton testified that, at approximately 9:30 p.m. on the Saturday before Thanksgiving 1996, Reeves, whom she knew as "Grip," had arrived at her apartment and had been very quiet. When Hampton and her friend Christine asked Reeves what was wrong, he initially did not say anything but later told them that "he had done something really bad," that "he had just shot and killed a man," that "he shot him in the back of his head," and that a "woman and a baby" had been "in a car" during the incident. Hampton further testified that Reeves had told them that "he wanted to watch the news to see if it was on," that she had switched channels so that they could watch the "one report of a killing" on each local station, and that she had turned off the television when the reports on that incident were over.
Detective Rick Bergman of the Montgomery County Sheriff's Office testified that Brookshire had given several statements in which she had described the intruders. On November 29, 1996, Detective Bergman arrested Reeves, photographed him, and created an array with Reeves' photograph and photographs of individuals bearing physical characteristics similar to Reeves'. On November 30, 1996, Detective Bergman showed Brookshire the photo spread, and she identified Reeves as the first man that had entered the home. From another photo spread, she identified Jackson as the masked individual who had been the second man to enter the home.
In his defense, Reeves presented witnesses' testimony to dispute the state's identification evidence.
Reeves was found guilty of aggravated robbery, aggravated burglary, and aggravated murder, each with a firearm and a repeat violent offender specification, and of having weapons while under disability. The trial court imposed consecutive prison terms of five years for aggravated robbery, five years for aggravated burglary, a life sentence for aggravated murder, two years for having weapons while under disability, three years actual incarceration for the three merged firearm specifications, and nine years imprisonment for the three merged repeat violent offender specifications.
Reeves appeals, raising five assignments of error.
 I. WHETHER THE DEFENDANT WAS DEPRIVED OF HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AND DUE PROCESS OF LAW IN VIOLATION OF THE UNITED STATES CONSTITUTION, AND THE RULES OF EVIDENCE, WHEN THE STATE INTRODUCED EVIDENCE OF OTHER ACTS OF THE DEFENDANT INDEPENDENT OF THE OFFENSES FOR WHICH HE WAS ON TRIAL, WHERE THE DEFENDANT HAD NOT PUT EVIDENCE OF HIS CHARACTER IN ISSUE, WHICH ACTS WERE NOT RELEVANT AND HIGHLY PREJUDICIAL IN NATURE AND NOT TENDING TO SHOW MOTIVE, OPPORTUNITY, INTENT, PREPARATION, PLAN, IDENTITY, KNOWLEDGE, COMMON SCHEME, OR ABSENCE OF MISTAKE OR ACCIDENT.
Reeves contends that the trial court erred in overruling his April 11, 1997 motion in limine and in permitting Hampton to testify that, on November 23, 1996, he had admitted to having shot a killed a man because his alleged statements did not relate to the charged offenses and was thus "other crimes, wrongs or acts" evidence, inadmissible under Evid.R. 404(B) and 403(A). Specifically, Reeves argues that the "details of the activity alleged in this statement do not comport with the details of the crime with which [he] has been charged" in that his alleged statements pertained to the self-defense shooting of an armed robber while a "woman and a baby" had been "in a car." The state argued at trial that Reeves' statements had concerned the charged offenses and were thus admissible under Evid.R. 804(B)(3) as statements against interest. The trial court agreed and allowed Hampton to testify on the matter.
Despite the discrepancy between Hampton's testimony that Reeves had told her that a "woman and a baby" were "in a car" during the incident and Brookshire's testimony that she and her three-year-old son were either already inside or heading for a living room closet when she heard the gunshot, the evidence supports the conclusion that Reeves' statements concerned the charged offenses rather than some other criminal or wrongful act. Hampton's testimony that Reeves had wanted to watch each news report of a killing further supports the trial court's finding that Reeves' alleged statement pertained to the charged offenses. In fact, the record reflects that Hampton did not testify about details of an armed robbery and Reeves' act in self-defense. Thus, the trial court acted well within its discretion in determining that Reeves' alleged statement was not evidence of other criminal or wrongful acts prohibitted under Evid.R. 404(B). Furthermore, because the alleged statements were highly probative of Reeves' involvement in the charged offenses, the trial court properly concluded that, under Evid.R. 403(A), the the danger of unfair prejudice, of confusion, or of misleading the jury did not substantially outweigh the probative value of Hampton's testimony.
The first assignment of error is overruled.
 II. WHETHER THE APPELLANT'S RIGHT TO DUE PROCESS SECURED BY THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION WAS VIOLATED WHEN THE TRIAL COURT ALLOWED USE OF TAINTED IDENTIFICATION TESTIMONY.
Reeves contends that the photographic array from which Brookshire identified him was impermissibly suggestive and tainted her in-court identification of him.
To warrant suppression of identification testimony, the accused bears the burden of showing that the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" and that the identification itself was unreliable under the totality of the circumstances. Manson v. Brathwaite (1977), 432 U.S. 98,106; Neil v. Biggers (1972), 409 U.S. 188, 199; Simmons v.United States (1968), 390 U.S. 377, 384. See, also, State v. Broom
(1988), 40 Ohio St.3d 277, 284; State v. Moody (1978), 55 Ohio St.2d 64,67. In Manson, the Supreme Court explained:
 [R]eliability is the linchpin in determining the admissibility of identification testimony * * *. The factors to be considered are set out in [Neil v. Biggers (1972) 409 U.S. 188, 199-200]. These include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.
Manson, 432 U.S. at 114.
At the April 25, 1997 suppression hearing, Brookshire testified that she had stood face-to-face with Reeves, that she had had an opportunity to see his face while they were in the kitchen, and that she had also been able to see him while they were in the dining room. Brookshire made an in-court identification of Reeves and testified that she had recognized him based on her observations of him during the incident. She testified that Detective Bergman had instructed her on making a photographic identification and that she had had no difficulty recognizing Reeves from the photographic array. On cross examination, Brookshire testified that approximately thirty seconds had elapsed from the time Reeves had entered the kitchen until the time that the second man had taken her into the living room, that she had never seen Reeves prior to the incident, that she had been upset and "in shock" during the incident and suffering emotional trauma during the police investigation. Reeves also pointed out inconsistencies in the several descriptions of him that Brookshire had given to the police.
Detective Bergman testified that he had photographed Reeves after arresting him, had entered Reeves' image into the "capture-and-retrieval" computer system, and, along with another officer, had created the photo spread by selecting photographs of individuals with "like and similar characteristics to make the spread as fair as possible" from a database containing approximately 60,000 photographs. He stated that he had read the "Photographic Show-Up Instructions" to Brookshire on November 30, 1996, that she had indicated her understanding of the instructions, that she had made "a pretty immediate identification of photograph 2 by putting her finger on that picture and stating something to the effect of `That's him,'" and that she had recalled his lips, nose, and mustache.
Reeves argued that the photo spread was suggestive because his "photograph stands out in distinction to all the rest of the photographs" in that he appeared to be the only mixed-race individual, that his skin color was lighter than the other individuals pictured, that his picture showed more prominent features than the others, and that his hair had been pulled back so that he more closely resembled the description previously given by Brookshire. Reeves further asserted that Brookshire's identification of him was unreliable because she had seen him on November 23, 1996 for no longer than thirty seconds in a dark room, had paid little attention to his appearance during the traumatic incident, had given inaccurate descriptions of his appearance to police on different occasions, had been influenced by "psychological factors" when viewing the photographic array, and had a distorted recollection of his appearance due to the one week lapse of time between the incident and her identification of his photograph. The trial court overruled Reeves' motion to suppress, concluding that "there is no unduly or impermissibly suggestive pretrial photo identification procedure."
We reviewed the photo spread containing Reeves' picture. Despite Reeves' complaints that his skin tone was significantly lighter or that his nose and lips were notably thinner than the other individuals so as to sway Brookshire into selecting his photograph, the trial court correctly determined that the photo spread was fair and was not impermissibly suggestive. This conclusion is supported by Detective Bergman's testimony that a computer database was used to select photographs of individuals with like and similar characteristics to Reeves' appearance. Furthermore, based on the testimony of Brookshire and Detective Bergman, we do not agree with Reeves that Brookshire's identification of him was unreliable.
The second assignment of error is overruled.
 III. WHETHER THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S RULE 29 MOTION ON THE AGGRAVATED MURDER CHARGE WHEN THERE WAS NO EVIDENCE OF PRIOR CALCULATION AND DESIGN.
Reeves contends that the trial court should have granted his Crim.R. 29(A) motion on the aggravated murder charge because the state's evidence on the element of "prior calculation and design" was insufficient as a matter of law.
Reeves was indicted on one count of aggravated murder, in violation of R.C. 2903.01(B), which provides:
 No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit kidnaping, rape, aggravated arson or arson, aggravated robbery or robbery, aggravated burglary or burglary, or escape.
Because Reeves was not charged with aggravated murder in violation of R.C. 2903.01(A), which contains the element of prior calculation and design, the state was not required to show that he had acted with prior calculation and design, and the trial court correctly overruled his motion for a judgment of acquittal.
The third assignment of error is overruled.
 IV. WHETHER THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S RULE 29 MOTION REGARDING THE OFFENSE OF BURGLARY WHEN THERE WAS INSUFFICIENT EVIDENCE OF FORCE, STEALTH OR DECEPTION.
Reeves contends that the state's evidence was insufficient to support his conviction for aggravated burglary because it was not shown that he had trespassed into the residence by force, stealth, or deception.
Crim.R. 29(A) provides, in pertinent part:
 The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses.
The relevant question for reviewing an insufficiency of the evidence claim is whether "any rational factfinder viewing the evidence in a light most favorable to the state could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Dennis (1997), 79 Ohio St.3d 421, 430, citingJackson v. Virginia (1979), 443 U.S. 307, 319; State v. Jenks
(1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
Reeves was charged with aggravated burglary, in violation of R.C. 2911.11, which provides in pertinent part:
 (A) No person, by force, stealth, or deception, shall trespass in an occupied structure * * * when another person other than an accomplice of the offender is present, with purpose to commit in the structure * * * any criminal offense, if any of the following apply:
* * *
 (2) The offender has a deadly weapon or dangerous ordnance on or about the offender's person or under the offender's control.
R.C. 2901.01(A)(1) defines force as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." Stealth, although undefined in the Revised Code, has been defined by courts to mean "any secret, sly or clandestine act to avoid discovery and to gain entrance into or to remain within a residence of another without permission." Statev. Ward (1993), 85 Ohio App.3d 537, 540, quoting State v. Lane
(1976), 50 Ohio App.2d 41, 47. It has been held that evidence of an entry through "a back entrance secluded from view" was sufficient to establish the element of stealth. State v. Wolhfeil
(Apr. 2, 1987), Cuyahoga App. No. 51983, unreported.
The trial court overruled Reeves' motion for a directed verdict on the aggravated burglary charge because "there's evidence for the jury to find that stealth was the means of — means by which entry was gained through the premises." On appeal, Reeves contends that Brookshire's testimony that she had heard "an odd noise, like a bang of some kind" at the time of his entry and the fact that Jackson, the boyfriend of one of Brookshire's relatives, had been invited inside the home before and "was perhaps even expected back that very evening" shows that he did not entered the premises by stealth. He further argues that he did not use force to enter the home because the back door "was open for ventilation" and "may in fact have actually been propped open by a large water bottle."
Based on Brookshire's testimony that she had never seen Reeves prior to the incident and that he had entered the home at night through the back door, a rational factfinder could have found that he had entered by stealth. Having concluded that the evidence supported a finding of entry by stealth, we need not determine whether Reeves also used force to enter the home.
Because the trial court appropriately overruled his Crim.R. 29(A) motion on the aggravated burglary charge, the fourth assignment of error is overruled.
 V. WHETHER THE APPELLANT WAS DENIED DUE PROCESS OF LAW DUE TO THE ADMISSION INTO EVIDENCE OF GRUESOME AND INFLAMMATORY PHOTOGRAPHS WHOSE PREJUDICIAL IMPACT SUBSTANTIALLY OUTWEIGHED THEIR PROBATIVE VALUE.
Reeves insists that the trial court erred by admitting "gruesome photographs" of the victim's body that were "both repetitive and cumulative in nature" and "had no probative value."
In determining the admissibility of a photograph under Evid.R. 403, "a trial court may reject an otherwise admissible photograph which, because of its inflammatory nature, creates a danger of prejudicial impact that substantially outweighs the probative value of the photograph as evidence." State v. Morales
(1987), 32 Ohio St.3d 252, 257. Absent such a danger, the photograph is admissible. Id. at 257. "[T]he fact that a photograph may be considered gruesome is not, in and of itself, grounds for preventing its introduction into evidence." State v.Apanovitch (1987), 33 Ohio St.3d 19, 25. The trial court has broad discretion in balancing the probative value against the danger of unfair prejudice, and its determination will not be disturbed on appeal absent a clear abuse of discretion. State v.Harcourt (1988), 46 Ohio App.3d 52, 55.
Reeves argued that Exhibits E and F, which were autopsy slides created by the coroner depicting the interior of Rogers' skull, were "exceedingly gross," were unnecessary to further the coroner's testimony, and would be introduced only to appeal to the passion of the jury. According to the state, Exhibits E and F showed the bullet lodged in Rogers' skull and were "necessary to demonstrate the cause of death, and to show that the bullet was fragmented." The trial court ruled that the jury could view Exhibits E and F along with other autopsy slides. Dr. David M. Smith, the deputy coroner who had performed the autopsy of Rogers, testified that his slides would assist him in explaining the results of his examination. Dr. Smith referred to Exhibit E to explain that the bullet had entered and fractured Rogers' skull, causing injury to his brain and his death, that the bullet had broken apart while inside the skull, and that some fragments of the bullet had remained inside the skull while others had exited the body. Dr. Smith described Exhibit F as "a close-up picture of the same area on the inner aspect of the skull" showing more clearly the area of injury and the bullet fragments. Dr. Smith stated his opinion, to a reasonable degree of medical certainty, that Rogers had died of a gunshot wound to the head.
In our opinion, the trial court did not abuse its discretion in determining that the probative value of Exhibits E and F was not substantially outweighed by a danger of unfair prejudice. It was not unreasonable to find that the slides would assist the jury in understanding Dr. Smith's testimony on the cause of Rogers' death and on the bullet fragmentation, which was relevant to show that the bullet fragments found in the bathroom had come from the same bullet that had struck Rogers. Thus, the trial court did not abuse its discretion in ruling the slides admissible.
The fifth assignment of error is overruled.
The judgment of the trial court will be affirmed.
BROGAN, J. and YOUNG, J., concur.
Copies mailed to:
John J. Amarante
Joyce M. Deitering
Hon. David Gowdown